We will hear argument first in case number 24-2062, Board of Regents of the University of Texas v. Boston Scientific. Mr. Shaw. May it please the Court to deke Shaw for defendant appellant, Boston Scientific Corporation. The asserted patent claims cover a composition comprising a biodegradable polymer fiber composed of two immiscible phases where the second phase is a drug. The jury's verdict, finding the claims not invalid and also infringed, cannot be squared with the prior art or the claim limitations. It can be explained only by plaintiff's pervasive and prejudicial conduct at trial, including, among other things, telling the jury that the invalidity evidence must be, quote, good enough to commit you to a psychiatric institution or, quote, to take away your children. To start, I'd like to focus on two of the questions presented, anticipation by the song prior art patent and non-infringement based on immiscibility. Before you get into the merits, deeply into the merits of the anticipation issue, I would like for you to give us your take on the distinction between three of the claims, one, I think 11, 16, versus 26. What's your argument with respect to 26 in particular, which has the varying rates? So on the varying rates limitation, that is addressed in the appendix testimony. There's only evidence from Dr. Mooney, Boston's scientific expert. There was no rebuttal evidence given by plaintiffs, and that's appendix 18, 176 to 177. And what that evidence, I think, clearly and convincingly demonstrates in the record there is that it's really extremely difficult to engineer a product to get anything but varying rates of release and that the song patent was not designed to achieve that very hard objective of a fixed rate of release. Rather, it discloses a varying rate of release necessarily by its design. That is, the expert explains how I think this is. The design is plainly intentional in the case of song, not simply a product of the fact that sometimes some comes out and sometimes less comes out, just as a matter of the likelihood of any process having variance to it. Right. And as Dr. Mooney explains, the reason in song it is necessarily varying is because the therapeutic agent or whatever is the agent that's loaded into the fiber, it has different concentrations to the length of the fiber. I thought he said at least two things, maybe three. As you say, it was two transcript pages, so there's very, very little. The first thing I think he said is, well, song shows it's varying because the medicine comes out or the substance comes out and then it stops coming out. That can't possibly be what varying rates mean. Another thing he says, I think, is that if you look at figure 1A, I think in song, I think that's what it was, that the pockets of the substance are different distances from the surface. Right. And he says, well, that must mean that there's a varying rate. That must mean has had me scratching my head. And maybe you can help me understand why varying rates must follow from the fact that some of the pockets are near the surface. Right. I think it's two things, the distance of the pockets and the concentration of the drug through the fiber. So if you had a little bit of drug, as the diagram shows, right, in 1A, at the very end where it is coming out of the fiber at first, that will immediately be released. But you're not going to have an equal distribution of drug throughout the fiber. So as the drug from the other end exits the fiber or is released, it would be very, very hard to get that to be at the same rate. Right. This was not engineered to be a steady state release. And so it's just going to come out as the gradient comes. It's a higher concentration, lower concentration. It travels a further distance. There's no reason to think that the drug is going to be released at the same instant. It would have to be engineered specifically to make that happen. I guess I'm not, I don't have in my head a mental picture of how it is that the distance while still inside the fiber changes the rate of release. Because I would think the release starts at the point at which it exits the fiber. Right. How long it took to get from deep inside that cave to the opening, that's what I'm confused about. Sure. There are two things if you look at that diagram. It's the distance, but it's also, it's not the same number of blocks of agents, right? This is just drug that's dispersed throughout the fiber. So if you have more drug at the one spot in the fiber, and that is all released at the same time, and then you have less drug, right? It's not even, what you can see in the diagram, it's not an even distribution of the drug throughout the fiber. So you're going to have more at time X1, so much release. At time X2, more or less drug release as that drug that's in a given spot in the fiber comes through. Let me ask you one more question. It seems to me that was a tiny amount of testimony on this claim 26 and that claim element. There was, I take it, essentially no answer to it in the evidence. Essentially no answer to the second part, not the first that comes out and then it stops. In, for example, the red brief here. But for JMO, isn't it enough to say that the jury could just have concluded that were found that what Dr. Mooney said about that was just not convincing? I'm even having trouble understanding it. Yeah, well, I think when you have unrebutted expert testimony that does go through this, and I think experts would understand that engineering a steady state of release in a complicated thing like this is really, really difficult. And there's nothing in Song, nothing that indicates it was engineered to do that. What you really seem to be saying is that there's virtually no chance that claim 26 adds anything to the rest of the package. I think that's the upshot of Dr. Mooney's testimony, that it's always going to be satisfied here. The one thing we can say is if there's any doubt about claim 26, certainly the court did not separately adjudicate it. That is, it found it, you know, everything. It denied JMO kind of across the board on what we think is a misapprehension that the independent claim and the two other claims were not anticipated. So I think if there is, we obviously think that all four claims are anticipated. But if there's any doubt. If we were to agree with you on the other claims, what's left for us changes rather dramatically if claim 26 is not anticipated. So in terms of just how much we need to decide, it's quite important. Right. So if we're in the universe where you find three claims anticipated but not claim 26 anticipated, that's the hypothetical.  Then, you know, I think there's a couple of different things. One is you would have to reach the other arguments, like indisability, which I'm happy to talk about, because that applies equally to all four of the claims and the rest of the arguments that we have there. This feels, I guess, a little bit like what we often call housekeeping. But there has been no suggestion, has there, that if claim 26 were to survive entirely, that damages need to be redone? Nobody has argued that issue in terms of whether there has to be a new trial. But I think at a minimum what would have to happen if you didn't find it invalid or non-infringement on other grounds and you had to get to it. I think there would be appropriate remand to the district court to consider whether that claim has been anticipated in the first instance, because the district court didn't have the opportunity. It was under the impression that the independent claim wasn't anticipated, and so it never had to grapple with that evidence. But again, even if you didn't think that was anticipated, we think it's unrebutted evidence. It's anticipated, clear, and convincing. You at least have to adjudicate the other claims. We think we have a very strong admissibility argument on 26 as well. But you're also both contending that if there's unrebutted expert testimony, that by definition that would lead to the JMAW outcome you think is appropriate? Not by definition. I think if the expert testimony, like say, for example, contradicted the prior art, this court has case law, that that would not be, you know, that's not good enough for JMAW on that. But here there's no indication of that. It's perfectly consistent with the prior art. It was unrebutted, and so I think here in this situation, I think it is good enough for JMAW on that claim. I'm happy to talk more about the independent claims on that or move on to admissibility? I want to move on to admissibility. Okay, great. So the infringement verdict can't stand, including on claim 26, because the accused product, and that's the synergy stent, does not satisfy that admissible claim limitation. The parties agreed that the term admissible means that the phases are, quote, incapable of dissolving into one another, end quote. Yet plaintiff does not dispute that the stent's polymer and drug phases do in fact dissolve into one another to some extent. That is, they are at least partially admissible. Doesn't this just mean that even the claim construction itself is lacking in precision for one thing to dissolve into another or into one another? Could mean at all or it could mean completely so that they're indistinguishable and the language of the claim construction, I guess I want to suggest, does not clearly choose between those two things. I don't think that's pretty much what the district court said in treating the testimony that you are saying is insufficient as not really off, not really contradicting. Well, Your Honor, I don't think so because to read it as requiring complete dissolution to form one phase, which is the construction that they're relying on, would mean that you could have 99% dissolution and it would still be admissible. There may be edge cases, but you haven't suggested that your product, at least I don't remember a suggestion that your product will dissolve 99%. No, I'm just talking about the claim construction, though. The claim construction is just what the term means. And if it means, the reason what I'm pushing back on is the notion it could be one or the other. I don't think it could be what they propose, which is complete dissolution, unless there's complete dissolution into one homogenous phase, it's admissible. Because what that would mean is you could have any amount of dissolution short of 100% and yet you would call it admissible. And that doesn't jive with just the common sense of it. And it's not just the common sense of it. If you look at the patent itself, and this is at appendix 115, it's column 17 to 18 of the patent itself, it uses terms when it's talking about, it's not talking about the two phases, but about admissibility in general. And so it uses terms like low admissibility, highly admissible, moderately admissible. And so that suggests that there's a spectrum. Sure, let me just give you a specific. So this is under example one, your honor, on 115. And you'll see there's, if you go down to about line 48, it says in this embodiment, solvent A has low admissibility with water and is very admissible with that. And so I'm just using it for the limited point that admissible, low admissibility, and very admissible can't mean the same thing as admissible. But under their proposed claim construction, if something has low admissibility, high admissibility, all of that is still admissible because it's not complete. It's not 100% dissolved into the solution. So I think, I don't think this is a question of where we have an ambiguous claim construction and either side can argue it. I think this contradicts the claim construction. Incapable of dissolving into one another doesn't mean it can dissolve almost completely. I think I'm remembering something from the record. I think it was, I don't know, encyclopedia of some sort. Don't worry about the time. Dictionary or something where the word dissolution was defined much like the other side's definition of admissible, namely dissolution to form a single phase. What do you make of that? So what I do know is when they tried to introduce exhibits that had that sort of definition, dissolution into a single phase, Boston Scientific objected and the district court granted that objection and said, we've already construed the claim. And so Boston Scientific's objection was that is adding limitations. That's expanding the claim construction. The district court granted and said, I've already construed that term and excluded exhibits like that. And so when they attempted to do it, Boston Science objected and the court said no. Now, obviously in the J-Mall opinion, the court let that testimony in. We think that's wrong for the same reason, because it contradicts the claim construction. This is not just an expert's understanding or a gloss on it. It fundamentally changes the scope. Because again, virtually everything is going to fall under the admissible unless it completely dissolves and you get 100% dissolution. That's a dramatic expansion of the scope of the claim patent. They used the term admissible. They didn't say partially admissible or highly admissible but not completely. They said admissible. They chose that claim term and now they want to expand it to cover everything short of complete admissibility. And we think that is contradictory. The fact that this patent seems to be directed at an emulsion, oil and water, or in this case, I guess, water and oil. Or is it oil and water? Is that a fair way to characterize what admissible means for purposes of this patent? I think so, because ultimately the claim here is a composition claim, right, about the patent. If you just take this claim one, you know, just as the independent claim, it's claiming a composition of at least one biodegradable polymer composed of a first phase and a second phase. And the first phase and second phase is being admissible. It doesn't talk about the state. We're talking about the liquid or solid. Obviously it's a solid when it's, for example, the accused product, right, when the coating dries and is on the scent, that is a solid product. And so I think in context we have the same problem here. Unless it's kind of completely dissolved into one another, every single accused product is going to be admissible. That, again, is a dramatic expansion of the scope as it's claimed. They could have claimed something broader, right? Some sort of complete dissolution. But that's not what it claimed. It says the phases have to be admissible, no mixing, no dissolution into one another, incapable of dissolving into one another as the court construed. Your admissibility argument is your first argument against infringement. Correct. The second has to do with, I think what you say is, what you assert is an improper claim construction of fiber, or as you would prefer, polymer fiber. That second argument, if we thought there was something wrong with the claim construction, would lead at most to a new trial. Is that right? Not to J-MOM. Yeah. So I think there's an argument that if it were properly construed, then there is an evidence in the record to allow the verdict to stand. You said there was an argument. Is that your argument? Yes. That would be our first-line argument, not an argument. That is our argument, that if it were properly construed, polymer fiber would have correct common molecular orientation. It's their burden on infringement. They have not put any evidence in the record. They can't point to any evidence in the record that you have the sort of common molecular orientation that could give you a fiber. This was a pretrial claim construction, right? So evidence comes after that. Why would they put that evidence in? Well, Your Honor, I mean, they don't have anything in the record that suggests that it would be- Well, maybe they can create a new record. Right. If they suggest that they have something to do it, then I think that's a different question. But as the case has been litigated- Help me understand. What do you mean by common molecular orientation? It's generally not a good idea to introduce into the claim construction a term that makes you scratch your head. So help me- So this came through the expert's testimony at the claim construction stage, and it basically relates to once a fiber, a polymer fiber, how it's prepared. It's through stretching, and that stretching creates the way that it provides the tensile strength that, by the way, is described in the patent itself, is by aligning the molecules to go in the same direction to help promote that strength. So that's why- And that was a term of art, the polymer fiber term of art that the expert was asking the court. Now, because the court rejected it, you ended up with a construction of fiber that was essentially- I think it was thread-like of any shape or form. That was an unbounded construction that allowed plaintiffs to argue to the jury that a paper clip, a shopping bag handle, it could be an arm, the Mississippi River, would all qualify as fibers. But don't you also agree that we need to look at fiber in context? So if you're looking at the remainder of the limitation beyond just the part you want to focus on, doesn't that play an appropriate balance? Obviously, you also have polymer and biodegradable, but the key term here was, and this was the focus of the trial, is does this coating, right, which is essentially like an enamel that dries on the thing, is that a fiber? And if you don't have this unbounded definition of fiber that is anything thread-like of any shape or size, then you have a world in which a jury could find that enamel to be a fiber. But I think if you had any bounded definition of fiber, it doesn't even have to be the one that we proposed, but some bounded nature of fiber such that it couldn't be an arm, a shopping bag handle, or a paper clip, I think that would- So I think under this court's law that says, look, it can't be an unbounded thing that the jury has trouble applying. I think under that, there's a problematic construction here. I thought your argument, in part at least, was not so much that this is not a fiber, but that this is not a thread-like substance. And the argument you make is that the plaintiffs tried to insert into the jury's mind the notion that it didn't have to be thread-like by virtue of questions of Dr. Pitt that suggested that it didn't have to be thread-like. So to what extent is your argument based on the absence of any assertion that it is thread-like versus that it is not fiber? It's both of those. It's really three forms. It should have been polymer fiber. Fiber is unbounded, so it failed under this court's case law of having a construction that the jury can kind of administer. And then the third piece is the one that you raised, Judge Bryson, which ultimately, because of the way that it was defined, they fell back on the original rejected plain construction, which was having basically a large length-to-width ratio. And so essentially anything could qualify, and that's where I'm talking about the paper clip, the shopping bag handle, the arm, the Mississippi River. I wouldn't think of those things as thread-like. I would not think of them. I don't think any reasonable person would think of those things as thread-like. And yet that would have qualified based on the testimony. Now, did you make sufficient objection at the point at which that line of questioning was pursued? I mean, there's one point at which I think Dr. Pitt was asked something about whether it was necessary to be thread-like, and he said no. But I didn't see any objection. Well, I don't think – I don't recall – There was a motion in Lemony in which the judge said if he is asked is this thread-like, he has to answer that it is not. And yet he said that it was. Right. So you're right, there were objections made. I don't recall if there was an objection made at that particular point, But I think the point is that that can't be sufficient evidence of infringement if it is based upon – A, it's not even based on the claim construction, which we think is flawed that they had, which is thread-like, even as unbounded as that is. It doesn't even conform to that claim construction. So it can't, by definition, be sufficient evidence under the claim construction, even if you accepted the claim construction. So I think on a whole host of grounds, the fiber construction and the evidence adduced at trial under it are insufficient. Now, as I understand the way this device is structured is that it's dipped in the – the stent is dipped into the sauce. And the sauce adheres to all the parts of the stent and dries. And therefore what you have is a very intricate structure, which if you were somehow magically to remove the stent, would look like a whole lot of hollow tubes. Is that accurate? I think that's fair. It itself is not thread-like or fibrous, but it is adhering to a stent. And so if you could magically make the stent disappear and you have that shape, yes, you would have the shape of the stent. And would you think that a jury could find that that shape was thread-like? Well, I think, again, even if a jury could find that that shape is – the question is, is the polymer itself a fiber, right? The biodegradable polymer has to be a fiber. And it was not – at the time, it's a liquid coating. As you said, it's dipped in. It doesn't have any of the traits of a fiber. Setting aside whether polymer or fiber is a term of art, a polymer can surely be formed into a shape that is thread-like. So my question is, is this one of those taken? This is not, because you could have fibers, absolutely, and this gets into the Strickler-Weber. You could have fibers that are woven around a stent, for example, a polymer that is woven around a stent. And those, we would concede, and Boston Scientific conceded, those are fibers. You're taking the polymer and you're literally weaving it around the stent as a fiber. That is not how this one applied. This one is very different than Strickler-Weber. This is, as you said, dipped into a liquid, and it's more like an enamel. You would have to chip it off. You can't, like, pull a thread of it off. So I guess – I think this is all kind of on the same subject. As I was reading the briefs and whatnot here, I kept feeling myself uncertain about this thread-like definition being applicable to the macro structure or to the micro structure. If you took a very long thread and wrapped it all around, and it kind of, I don't know, around a tube, and then took the tube out, at a macro level, that would not look like a thread. So what – so I'm genuinely uncertain what you think the right analysis, and why couldn't you have something that was, I don't know, molecularly oriented in a linear fashion, but in a liquefied form that sort of becomes liquid, and you can dip into it. Is that possibly polymer fiber, or does the fact that it comes out as a smooth-looking sheet preclude that? Right. What's the enlargement level that this question is supposed to be asking? Right. So I think it has to be thread-like in some independent way, right? Not just because it is something that is not at all itself a fiber or thread-like, and it happens to be put on a structure like an enamel that is thread-like, and therefore if you could magically make the object disappear, it would have a shape that looks like a thread. I don't think that satisfies it. The substance, the fiber itself has to be – Suppose that the stents were all in the form of hollow tubes, and you poured the polymer into the hollow tubes, so that what ended up as the polymer was something that looks very thread-like. Yeah, but the polymer itself is still not a fiber in that hypothetical, whether it's a fiber or not, because it doesn't – It's simply a fiber with a coating of titanium. Right, but it doesn't have any of the characteristics of the fiber other than the one that it happens to be poured in. So I guess if you accepted the unbounded definition of fiber as thread-like in any shape or form, maybe that would accept it, but that's why we take issue with the claimed construction itself, because it would be unbounded and allow all of those things that no expert in the field would recognize as a polymer fiber, which is a term of art, not just any polymer that you pour. What you're talking about is almost like a molding, right? Yeah. There are lots of polymers, and this is in the expert testimony. There are lots of polymers that you can pour into a mold, and they find that. Those are not polymer fibers. Except that if you have one of those that ends up, once you break the mold open, sure enough, what you've got is a very thin cylindrical tube that goes on for some distance. It seems to me you've got something that looks and acts a lot like a fiber. You have something that looks thread-like. I will grant you that, but that goes back to the definition, which I think is flawed. It's not just anything thread-like is a fiber. It has to have some characteristics, a polymer fiber. So there are only certain polymers you can use, as experts in the field would agree, to actually create a fiber. That's the argument that the molecules have to be lined up. Yeah, and you don't have to use those words, but it's just the notion that there is something more to it than just something thread-like, which would encompass a whole lot more. If it's okay, if I may mention, if the court is interested, a few of our new trial arguments that claim 26 is out there, I do think that that would inform what the disposition of this case would be, unless you would remand it for new trial, regardless. I would like to ask a question on the new trial threat. So there were instances where your client objected, but there were other instances where your client did not object. So what I would ask, since we're speaking on a new trial, only focus on the instances where there actually were objections. Okay, so let me focus on, I think, the four categories where there were clearly objections, and I will leave the rest out. There were obviously a lot of disparaging the expert, all of that. They didn't object over and over, because the objections were getting excessive. But let me talk about the four main categories briefly, and I'll give you the objections. So first, I started in the opening with the invalidity standard of committing you to a psych institution and taking your children away. It's Appendix 17-4. What's the basis for that objection? It's a true proposition. Well, it's highly inflammatory and designed really to play on the juror's emotions. You tell a juror that the evidence has to be good enough to- No, I get why you- Right. So that's the reason. And other courts, like the Carrier case, in actually the same district, that is out of bounds. You know, most trial litigators are shocked when they read that the judge allowed that sort of argument because of its ability to skew the juror's emotions. If you tell them, I mean, no evidence is going to be good enough to take away my kid from me. And so, you know, the notion that that was the sort of evidence that you have to have in order to find invalidity, it seems inappropriate. 17-421 in the opening statement, and then the judge essentially said, well, that's just attorney argument, and then they went on to repeat about taking your kids away. That was in the opening. They repeated it in the closing. This is all at 4950. We didn't reobject there. I also don't want to make it, because we're already over time. Can you just- Yes. I'll just- I'll give you the site. Sure. Yes. Okay. Strickler and Weber objected over five times, all overruled, before opening an emotion in limine during the opening. That's A-17-447. At trial, that's A-17-933. And that's right before the same thing. When you say Strickler and Weber, these are the two patent applications.  Right. These are the two patent applications. And the last objection was the one, the 1793 to 17994. That's where their expert says, well, Strickler and Weber is the same thing as the Synergy and Sten, and therefore it has to be a fiber. The third one, the IPRs, that was also objected to multiple times. The first time is Appendix 17-427. That was in their opening before any- They say, well, we opened the door to it in our opening. Their opening statement came first. So they mentioned it first. Boston Scientific objected at A-17-427. And so that was- There was a curative instruction. There was at the end of the trial. So this was in the opening. It was mentioned. And then again at trial. Did you object at the close of the opening? Yes. Objected every time on the IPR. And then we got the- Not during the opening, I take it. No, it was during, actually, Your Honor. Oh, really? Yeah, yeah. There were multiple objections during the opening. Seven were sustained. There were multiple others, like this one, that were overruled, essentially. But yes. And at a certain point, they stopped objecting. But on this particular issue, is the following a correct description? The other side made this point during opening. You made an objection. And there was a curative instruction. But then during your- Was it expert testimony? Or anyway, during evidence, you or your witness said something like, this is our first opportunity. And I think, I thought that the district court in later, in the post-trial ruling, said that you opened the door to their doing this again. That happened in our opening. So their opening went, they brought up IPR. We objected, did not get a- We mean your opening. I'm sorry. They went first. They gave their opening. They brought up the IPR, Boston Scientific objective, no objective, no curative instruction. Then in our opening is when that statement was made. Did you ask for a curative instruction?  Did you ask for a curative instruction at the close of their opening or during their opening? I can see exactly what- It may have just been, let's see here, 17-427. The exact wording for you. There was a sidebar. Did your, normally your opening would come at the beginning of your case. Did you have your opening immediately after their opening? Yeah, they were plaintiffs, so they went first. Right, but did they then put on their case and then you opened and put on your case? Or did you have sequential openings at the beginning of the case? I believe it was their opening and our opening, to your honor. Was evidence in between or evidence- No, no, evidence, the trial after. Yeah, the rest of the evidence after, yes. So that was that one. And the last one is the AROD that was objected to. It's not in the JA. It's the docket, District Court docket 347-1. It was a letter objecting to the AROD video. Was it a letter? What was the time of the letter? It wasn't objected to live? It was right before the opening statement. I think it was January. It was the day before the opening statement, asking that that not be allowed in the opening. That was overruled. Okay, so basically something where it was clear from kind of the exchange of demonstrations and the like that this was going to be an open case. Right. A letter was given to the court and that was overruled. Right, and that's exactly, that was overruled. So the AROD video came into the, I believe it was in the opening. And then later on during trial is when they equated, I think it was in the closing statement, A18-347. There was no additional objection. But that's when they equated Boston Scientific Expert to AROD. So that's just the sites on everything. Okay, why don't you sit down. You'll get a bunch of time. Yeah, I appreciate it. Good afternoon, Your Honor. Sean LaHod of Session Graphic for the Athletes University of Texas and Tissue Gen. Can we talk about Claim 26 first, unless the court has any questions? So Claim 26 requires a varying rate. Right, so rate at time X is a certain rate. Rate at time Y is a different rate. Song does not teach that. And it's not a function of, well, everything goes to zero. So Song either inherently or implicitly. But there's no statement at least, perhaps as a suggestion, that the varying state of the release is controlled. Rather, it simply says vary. So why isn't it correct, as Mr. Shaw says, that virtually any release would be varying? Because Song specifically teaches limiting and controlling the release. But not in the claim. The claim doesn't say controlled variation or anything like that. No, it's Claim 26 that says varying rate of release. Song does not teach varying rate of release. Song specifically teaches a fixed rate of release over time. We can see that in Song at column 3, lines 1 through 20. In particular, Song discusses that the solvent fills these channels and begins to dissolve the newly exposed active agent, which was in contact with the now-dissolved active agent, located in the opening. I'm sorry, where are you reading? I'm sorry. I have Song. Just column 3. Thank you. And what's the line number? I'm pointing the court to lines 1 through 20, but we can focus on line 15 as a start. The support matrix serves to limit the rate of dissolution by restricting the area of active agent in direct contact with the solvent of the ends of the channels within the support matrix. If you're limiting the contact between the active agent and the solvent, you are necessarily fixing that rate. We see that again in column 4 of Song, starting in that paragraph with line 6 or so. It says, rather, the support matrix serves to limit the rate of dissolution by restricting the area of active agent in direct contact with the solvent to the end of the channels within the support matrix. Thus, the solvent can gradually work its way into the fiber by following the continuous phase of the active agent. To limit it is not synonymous with making the rate uniform. It just says the rate is below N. Well, to limit it is not equivalent to having a varying rate of release over time. Because if you're fixing the area... I thought you were trying to make an argument that it's clear that Song does try very hard to make the rate of release uniform. Yes, non-variable. The language that you read about limiting the rate does not yet say anything about the variability of the rate, only its maximum. Well, I think limiting the contact area between the active agent and the solvent, that's what I'm focusing on. Do you have anything better in Song that you would point to on this variability point? I think those two points about limiting the area in contact with the solvent, I think, show that Song does not teach variable rate of return. So, to sum up then, you would point to the points you've already talked about just now. I think that those are the main things. You can also look at Figure 1, which is consistent with that statement. But I think those two portions in Column 3, lines 1 through 20, Column 4, lines 6 through 19 or so, I think establish that Song does not teach varying rate of release or within claims. Am I remembering right that you did not have any affirmative evidence from Dr. Pitt or otherwise about the variability of the rate in Song or the difficulty, even great difficulty, I think Dr. Mooney testified, of getting a rate of release to be uniform? Correct. That is correct. Dr. Pitt didn't address that. It wasn't necessary in our view because Dr. Mooney's testimony was very conclusory. He just said it's necessary. And Dr. Mooney's testimony, he conceded in his interpretation, he conceded that his interpretation of varying rate of return or varying rate of release, excuse me, would essentially render that term meaningless. That he even said, I don't know why it's in there. It doesn't mean anything under his view. Because in his view, everything goes to zero, so everything's got a variable rate of release. Well, that was his first point. I'm trying to put that point aside. I'm sorry, your Honor's question? I'm putting that point aside. Right on these two pages of the transcript, the first thing he says is there's a release and then it stops, so the rate must be varying because the second one was zero. I want to put that aside. Okay. But then he goes on. He didn't stop there. He had at least one more point that looked at figure 1A about the different, like really, I guess, two points. One, it's very, very hard to make any kind of release rate uniform. So, and there's no reason in the world to think that a release rate, therefore, in song would be uniform. That would be the, I'm elaborating a little, the default reading of song. And then the more particular thing about the dispersal of the substance in figure A at different points in the fiber. And I think my response, Your Honor, would be that that testimony is very topsy-turvy and it's inconsistent and contradicting to song. Song specifically teaches this very difficult aspect of limiting or controlling the rate of release. Right? It's not just we're going to throw these in the mix and see what happens. Song specifically teaches restricting the area. Song teaches that the fiber is less soluble than the active agent. Right? That's how you restrict the surface area exposed to the solvent. And so Dr. Moody's testimony cannot be reconciled with the teaching of song itself. It is difficult. I don't know if it is difficult. But clearly song tries to teach it, does teach it. And this notion of dispersing, again, it's inconsistent with song. Because song says we're going to keep that fiber intact. We're going to, that way we can limit the amount of surface area exposed to the solvent. And that solvent will eat away at the agent over time and that release will be the same. We want that same release. And the only way in song to change that is through, is if you mash it up or deform or destroy the fibers. But this notion of it would just diffuse, that's inconsistent with song's teachings. Is there any witness testimony that supports the argument you're making about uniform delivery? There's no testimony from Dr. Pitt or anyone else that would discuss this, that points to this at trial. Again, I don't think there's a rule that, especially when the party bears the burden, that, you know, uncontradictory testimony is enough. As counsel noted, if the testimony is inconsistent with the prior art, that can't be right. It can't be right. So, I'm having a hard time following the argument about why song either desires or ultimately succeeds in showing a uniform rate of release. If you look at, I mean, I know we can't trust figures too much, but if you look at the figure one, for example, each of these channels going down through, looks like they have different size openings where the either flavoring or drug is found. So, if you have, at one point, a large opening, presumably the solvent is going to dissolve more of the drug or flavoring than when you have a narrow opening. Would you agree with me on that? Yes, I think that's right. All right, but you've got some large and some small elements in the channels, and that would seem to me an invitation for variation. If you read what song says about that, and, you know, we cited a couple of instances in these columns, two columns, two sets of instances, even if you've got multiple openings, the amount of contact between, those openings are going to contain the agent, right? They will contain the agent, but don't they contain a different amount of agent depending on how far down into the polymer you have gone, how far the solvent has dissolved the flavoring or the drug? But it shouldn't, not under song. Why? Because that's not what song teaches. Song teaches that you've got these openings. But they're not uniform. But the exposure to the solvent will be uniform. That does not strike me as obvious, certainly from the diagrams. Maybe you can explain why it's uniform, but if you look at this diagram, it looks quite arbitrary as to which are large and which are small. And they vary in size. But if you look at what I'm trying to show you, Your Honor, Roger, I think Your Honor is looking at figure one. I am. And so these channels are going to, there's different sized openings, right? So I'm looking at it from the end. But the exposure to the solvent, right, is going to be the same because you're going to expose the same surface area to the solvent in each of these openings. Why would you say that those are the same surface areas? They look like, for example, pipes of different diameter. And the opening of a pipe, according to its diameter, will be quite different surface areas. Well, the opening of a pipe only has one surface area. I'm sorry. You were pointing to these six hatched areas at the top of figure one. That was my understanding of what... Right. So those pipes... Or all the way through. They're varying diameters, it looks like to me. At least Song didn't make an effort to show they weren't. Oh, so you're asking about the overall shape of the material? Each of these hatched figures contains either the flavoring or the drug, right? And therefore, the size of the openings to each of those at various points will change, it seems to me, if you look at this figure because it looks like they are different from one level to the next, in which case you will get a different amount of drug dissolution, correct? I think that's right. If they're shaped like this, that seems to be inconsistent with what Song is telling us in columns three and four. I don't know if I answered your question, but this seems to be inconsistent with what Song is telling us in figures three and four. And so in that regard, I think that Dr. Mooney's testimony is inconsistent with what Song is teaching, and I don't think that's enough. And to answer another question regarding damages, if claim 26 survives all the way through, there is no reason to, and you can affirm the damages, you can affirm the… The damages have not been separately appealed. Damages have not been separately appealed. There is no, the damages model is not a per-claim model, if you will. There is no allegation that it should have been. And so you can affirm in that regard without any kind of remand. You don't necessarily have to give up on anticipation of claims 1, 11, and 17, so if you want to say something about that, there are also other issues to talk about. Absolutely. I think with respect to this biodegradability point, again, as Dr. Pitt testified, there are… The 296 patent and Song contemplate different types of biodegradability. And so, as Dr. Pitt testified, Song teaches to keep the fiber intact during the release. That's not biodegradable as contemplated or claimed by the 296. And I think that Song contemplates more of a mechanical biodegradability, whereas the 296 is directed more towards chemical biodegradability. And Dr. Pitt articulated the difference between these two forms of biodegradability, while Dr. Mooney, a Boston scientific expert, said very little. I think the sum total of his testimony on biodegradable polymer is four lines in the transcript at 18168. And as we mentioned in our brief, Dr. Mooney just played word matching, didn't explain the similarity of the disclosure. And really, Boston Scientific's main argument on this point is that the word biodegradable is present in Song. And as we argued in our brief, it's not a word matching game. So, your point on this is that there are two different types of biodegradability that we're talking about, one mechanical, the other chemical? Yes, Ron. So, that is another reason, independent of Claim 26, to affirm the validity of the claims. And really, the bulk of Boston Scientific's arguments here, like for a lot of the other issues, come down to plant construction. They don't agree with our interpretation of biodegradable. And as the District Court found, there was no request to construe that term. And so, any kind of arguments about claim scope are waived after the verdict. The same issue with respect to immiscible, and in the scope of immiscible with respect to infringement. I'm going to move on to the infringement issue on immiscibility unless the Court has any questions on anticipation. With respect to immiscibility, there was substantial evidence that the two phases in the accused's sense are immiscible. There was a significant proportion of Dr. Pitts' testimony dedicated to this. He used Boston Scientific's own documents. There's JTX-2, PTX-42, PTX-47. And critically, he explained that the drug and polymer phases never dissolve into one another to form a homogeneous solution, and that makes them immiscible. Your Honor referred to a dictionary definition. That was used during Dr. Pitts' testimony. Dr. Pitts was providing... The word dissolution, if I remember. It was dissolved, yes. And dissolution, yes. This was at PTX-143, appendix 25500. And the Court... Well, as experts do, Dr. Pitts was providing the jury for his interpretation of the Court's construction. Experts are allowed to do that. And as part of it, rather than saying, well, here's my interpretation of one of the words in the construction, dissolve, he pointed to this dictionary definition from IUPAC. And notably, counsel was mentioning some objections to exhibits that were sustained. The district court permitted this dictionary definition, PTX-143, to be used over an objection. So there were some other dictionary definitions they were objected to. They were sustained. This one was objected to. That objection was overruled. And that can be found in appendix 17932. So as Dr. Pitts noted, if two phases are given the opportunity to mix and do not form a homogeneous solution, then they are immiscible. That was his testimony at 18282. It seems to me you're describing what is not in dispute, which is exactly what the testimony was and what the real dispute was. The real dispute is whether the word immiscible covers a situation in which there is some dissolution between the substances in the two phases, which I think is also undisputed that that is in fact the situation. So it's about the meaning of the word immiscible, not about facts on the ground.  Dr. Milley did not dispute that the polymers were in two, or the steps have two phases, and that they do not form a single phase solution over time. So it is a claim construction point, and it's too late now. If they didn't like it during trial, they should have objected. Stop claim construction, supplemental claim construction during trial, which is possible, but it's not improper. What is improper is to get a jury verdict. This is lightning ballast in related cases. You cannot argue claim scope and claim construction post-verdict. And that's what we did. That's what we heard today. We heard references to the intrinsic record, about how immiscibility is used. If they wanted a definition of immiscibility to mean absolute and precluding partial mixing or whatnot, they should have objected. They should have sought a supplemental claim construction from the court pre-verdict. It is too late post-verdict to make any kind of arguments regarding the scope of the claim term immiscible. Fibers. I was going to ask if the court had any further questions on immiscibility. So fibers. There was a lot of testimony about fibers at trial through Dr. Pink. And let me start by saying the method of application of this polymer to the scent is immaterial. This is not a patent about the method of application or how the polymer adheres to the scent. It is about the polymer as it exists in the form of the accused product, as made, sold, used, offered for sale, et cetera. This is not a method claim, not a manufacturing, not a process claim. So I think all the arguments about roll coating and painting it on and enamel are irrelevant, candidly. This is about whether or not there is a fiber on the scent. Well, if the roll coating produces something that does not look like or act like or is in anyone's view a fiber, then it is relevant. Because that's the way we know what the polymer looks like when it's done. Well, I think Your Honor just mentioned that when it's done, that's when we take a look at it. Right, but in order to know what it's going to look like when it's done, it's quite helpful to know how it got that way. It might be helpful, but it's not going to be responsive if the claim is not directed towards the method of application. It certainly is good to know, but the end result is going to be whether or not that's going to be what's judged against the claims is the end result. In your view, when you ask the question about what's a fiber, by looking at the shape of the resulting product or by looking at the microscopic structure of the substance making up that shape? I think you look at the overall macro. I think that was Your Honor's question, macro. The chemical or molecular structure, that's not part of the construction. That construction was... Well, the other side thinks that the construction is wrong. True, and they advocated for this common molecular orientation part. Their own expert, during a colloquy with the court, said that it is feasible for a polymer to lack a common molecular orientation. That's in the appendix at 17933. This was a colloquy before testimony. Judge? Procedure to where does this colloquy fit in? It fits in, I think, during our case in chief, but it was before testimony. So this was towards the end of our case in chief, before defendant's case in chief, before we rested, I believe. So this is the court asking Dr. Mooney a question? Yes. And is the jury in the room? No, Your Honor. So this was a colloquy. Judge Williams called Mr. Mooney up, as you can see in the previous page. He called Dr. Mooney up and wanted to ask a question. I'm not going to put words in the court's mouth, but what we have here, my thinking was it went to claim scope and he was revisiting what the parameters of a fiber would be. That's the position on my part. But what we know is that he asked the question, is there an example of a polymer fiber with a crystalline structure that lacks a common molecular orientation? And Dr. Mooney says, yes, that's feasible. So there is no intrinsic record support for fossil scientific additions to this construction regarding common orientation or polymer molecules. Those terms don't appear in the spec, and again, they are inconsistent with this statement from their own expert. Again, I don't want to misrepresent it. He was on the stand, he was at the podium, and Judge Williams was asking him a question before, outside the presentation. I don't know if the court has any questions on whether or not polymer fiber is a term of art. Clearly it's not. Fiber was correctly construed. There's an argument about thread-like, but that thread-like statement was part of Boston Scientific's proposed construction initially, and Boston Scientific doesn't explain what changed or how it went from good enough and sufficient to vague. And again, with respect to the infringement verdict itself, substantial evidence supports the jury's conclusion that the stents do have this fiber. There was measurements by Dr. Pitt. There was models. There were citations to submissions to the FDA by Boston Scientific in which it referred to the coating on the stents as ribbon-like. Ribbon-like does not sound to me like thread-like. I think that's going to be in the eye of the beholder, Your Honor. I can see a ribbon being a long ribbon of maybe like half an inch long, half an inch wide. Would you agree that generally something that you would call thread-like will be something that is solid and either cylindrical or some shape approaching cylindrical and extended? I don't think it needs to be limited to a shape that's a cylinder or something like a cylinder. Well, let's suppose it could be triangular in cross-section. But it's still, it's long and it's solid. It's not, for example, you wouldn't say a garden hose is a thread, right, because it's a cylinder. I don't know if I would... Would you agree with that? I don't know if I would agree with Your Honor on that. I can see... I'm going to go to the hardware store this weekend and find out if they're selling any threads. Any garden watering threads? Huh? Garden watering threads? Yeah. I think, especially given this construction, right, it says any length or shape, I don't think it has to be a solid... The construction says thread-like. And that's the question I'm having problems with is you're keeping, come back to saying something like a ribbon can be thread-like. I'm not seeing that. And I look at, for example, on the 296 patent at column 3, lines 12, et cetera. This describes the diameter of the various embodiments of the invention as being between about 20 to 40 to 60 microns. These are really small. Up to about 500 microns, which is half a millimeter, right? So that's diameters. These things have diameters. That sounds to me like something that is solid and extends over an extended period of time and has a small, very small diameter. You don't take issue with that as a way of thinking about what constitutes thread-like, right? I don't take issue with that as a way. I don't necessarily agree that it is that limiting with respect to... Well, but a high number is 500 microns, right? Yes. That's pretty small. Yes. And there are devices out there that have diameters that are hollow tubes that are 500 microns. There might have, perhaps, some catheters. Cath? Exactly. Catheters, even fiber optics can be hollow tubes, things like that. So I 100% mean it. With all due respect, I wouldn't agree that it has to be solid. I think that the cross-section can be, it can be a cylinder, hollow cylinder. Okay. So what about all of the over-the-top trial factors here? So I want to focus on three, because to Your Honor's limitation of stuff that was objected to. There wasn't... Let me start with the IPR. Here's how it worked with the IPR. We mentioned IPR during our opening. There was an objection. It was sustained. We moved on. It wasn't improper. There was no motion to eliminate. I get saying that. Well, you can't file a motion in the first place. Delaware often limits you to three motions. I don't know if it's true in this case, but it often is. But beyond that, you can't file a motion to eliminate about anything that may conceivably come up in an opening statement. Fair enough. And they chose not to file one. And they did what they were supposed to do. They objected. The objection was sustained. We moved on. A few minutes later during their opening, they said... Counsel said to the jury, this was the only opportunity they could have to challenge the patent, which is factually incorrect. Later on, there was some questioning. I approached the... We have a slide bar. While witnesses are being testified. Yes. I think it was during the testimony of the University of Texas' corporate rep, Ms. Schultz. And so we approached, and I told the court, Your Honor, I think they opened the door on this IPR by framing it this way, by telling the jury, incorrectly, that this was the only opportunity they had to invalidate these patents. And the district court agreed. Judge Williams agreed that they opened the door. But despite that finding that they opened the door, it wasn't a free-for-all. Like they say, I was limited to two questions. Did Boston Scientific file an IPR? The answer was no. Did Boston Scientific file an ex parte re-exam? The answer was no. And that was it. Fast forward to closing, and there were some statements made during closing about the IPR or the lack thereof, and there was an objection. And not only was the objection sustained, but there was a curative instruction. And not just one of these curative instructions that we sometimes see, where, oh, you'll disregard that, or I'm going to instruct you on it. It was, the IPR evidence has no bearing, no bearing on what you're going to decide today. And that was an instruction that Boston Scientific agreed to. They said it was fine. They had no problems with it at trial. Now they're calling it vague and sufficient. The jury is presumed to follow the instructions given, including the curative instructions. So, with respect to the IPR, that's the chronology. There was a significant, I think significant, limiting instruction approved by Boston Scientific, and so there's no prejudice there. Certainly, it wasn't, you know, did not become the focus of trial. I was limited to two questions of the witness connected. It was raised before opening. As Your Honor contemplated, before trial, before opening, there was an exchange of demonstratives. There was this A-Rod video. It was Alex Rodriguez testifying, not testifying. It was an interview, and he would say something like, I've never used performance-enhancing drugs. Okay, and so, but with respect to the objection, there was no objection after it was made. It was made, there was an objection before that. A demonstrative was used to that demonstrative that objection was overruled, and we were permitted to use that demonstrative. That's the A-Rod. So the objection by letter, I think was the term used, ahead of time, was actually ruled on and rejected, not just silent from the back? No, it was ruled on because there was no other way, there was an objection, there was no other way we could use that demonstrative. Okay. Absent of ruling. And that transcript with respect to that, we don't have that material in our joint... I don't think it's in there, Your Honor. I'm not 100% sure I can find it. Let me make sure I understand the sequence here. So you serve on them, the A-Rod video. They object by letter, you said, to the A-Rod video. To the court, yes. To the court, letter to the court. And the court then expressly rejects their objection, or simply doesn't deal with the... No, I think it overruled their objection to us using that demonstrative, so we were allowed to use it. Expressly overruled, yeah. Yeah, that's the only way that we could...  So that was, there's IPR, I don't know if Your Honor is interested, the clear and convincing standard, as Your Honor noted, was not inaccurate. Yeah, but there is this concept of inflammatory, and this is about as good an example as one could possibly think of, making the jurors think of something just that's inconceivable. And the court didn't feel like there was any kind of inflammation of the jury or incurable prejudice from this. There was any kind of argument, rank speculation. The jury was instructed on the burden of proof. The jury was told that statements made during openings and closing statements are not evidence. The jury was told by the court that he would be giving them instructions on the law and what burden to apply and what that burden was. There's no indication... I just want to make sure I have the fullest... I'm going to stop calling him by his nickname, but the Alex Rodriguez information. That got re-raised during the closing, and then no objection given the fact that there was originally an objection made to the demonstrative that was ruled on by the court overall. Is that correct? That's right. The later reference to A-Rod was not objected to. And can you just briefly tell me what the later reference was to Mr. Rodriguez in the closing? Just briefly describe that. It was being used as a way to gauge Dr. Mooney's credibility. So there was... We now know, or most folks know, that when Alex Rodriguez said he never used performance-enhancing drugs, maybe there's evidence to the contrary. And so it was a credibility... It was used as a credibility... I don't know, a metaphor or similar. I'm sorry? You're using it reportedly as a credibility reference. As a credibility... As a means by which the jury could assess credibility of Dr. Mooney. Not credibility of any kind of attorneys or anything. I think counsel is permitted to ask the jury to gauge the credibility of any witness, including an expert witness. And I think, you know, I will close on this issue of a new trial point, that it is the abuse of discretion standard, and there is significant deference given to the district court, especially in the Third Circuit, who sat through trial, who was able to gauge how often things were said, how things were said, when things were said, and the district court found nothing improper, nothing that rose to the level of anything more than zealot advocacy in this case. And if I may have one minute on our cross-appeal point? Really one minute. Really one minute. I'll take one minute, Your Honor. Bottom line is the district court misapplied the standard. He applied the wrong standard for willfulness. Egregious and sensual behavior is not the... Assume he applied the right standard. What's wrong with his result? Well, my understanding is you can't short-circuit the process that way. He applied the wrong standard. Well, he said, and I don't charge him just against this minute. He said at one point, what I think we all agree is the wrong standard, but then the standard when he came around to applying it, he applied what I think was the right standard. So you're reaching back to the first paragraph of his discussion where he picks up on a case of ours in which I think it's fair to say we didn't articulate the standard correctly, but he wrote what he wrote that did pick up on that case and then got the right standard later. Why is that error going back to that earlier statement? Well, I mean, I think we can only make the arguments based on what we read. And what he wrote was he was looking for evidence that would be enough to transform intentional annoyance to egregious and sanctioned behavior. He was looking for evidence that would be enough to show that Boston Scientific's conduct rose to the level of wanton maliciousness. So I don't think he was applying the right standard, even if later he may have mentioned the right standard as part of the conclusion. He was looking for evidence that would transform the conduct into, or rise the conduct, rise the conduct to egregious maliciousness. That was about a minute, I think. Give or take. Thank you. Thank you. I'm not sure if those six minutes are real minutes or the kind of minute we just had. I appreciate the court's indulgence. And on the time, as I know, we've run long. Unless the court prefers otherwise, maybe I'll start with the anticipation on claim 26. I just need to finish up my Alice Rodriguez. Oh, sure. Just to wrap it up for me. Can you give me the citations or whatever the appropriate things were so I can understand this kind of latter objection? So as you said, before the openings, when they exchange the exhibits. The exchange of demonstrations. Yeah, for the opening, yes. That's right. That's when you have this letter, which is on the district court docket at 347-1. It's the January 25, 2023 letter. It makes the objection. The district court then overrules that objection to plaintiff's opening demonstrative. That's a trial transcript 3-18-4-3. Unfortunately, that's not in the joint appendix, that part of the trial transcript where he overruled the objection. But I think the other side agreed. The transcript is public, yes. Pardon? The transcript is public? It's available on the docket. I believe it's available on the docket. I don't have the docket site for you that corresponds to that. But I think both sides are in agreement. It's available on the docket. We'll check again. But I think we may need to go to the parties if we need that. OK, if you need that. I think both sides are in agreement that the court did overrule that objection, though. That was for the opening. And then in the closing, they came back and said, Dr. Mooney, Boston scientific expert, is the equivalent of A-Rod. And that was in the closing. There was no objection, no re-objection there. And I take it their point is sometimes people you admire say false things. Well, A-Rod is probably the most hated sports figure of all time. And so this was a pretty, and this is in the Northeast, in Delaware. So it's a pretty inflammatory comment, Your Honor. And that's why it made the top four of things in our new file. It's worse than me. Yeah, so right. But it has special salience. That's why they used it, just like taking your kids away and admitting you to a psych hospital was designed to inflame the jury. And again, these aren't one isolated thing. Maybe if you said it was all in isolation, but when you put the sum total of these things together. That's a very good question.  Anticipation. Thank you. So just to start laser-like on claim 26, all you've heard is attorney argument. And this attorney argument that you heard today, pointing to two excerpts in song, is not even in the red brief. It's not even in the appellate brief. And those excerpts don't come close to showing a fixed rate of release. Now you compare that to the testimony from Dr. Mooney, who says, quote, it's very, very difficult to get a drug delivery system where the release rate doesn't change with time. You actually have to do some pretty special things to make that happen. And then he explains how in song figure 1, figure 1A, it doesn't happen in song. Now you have that uncontroverted testimony at trial that shows that with jives with common sense, it's really hard to get a fixed rate of release when you have this sort of system. And all you have in opposition to that is attorney argument. That is not enough to rebut the clear and convincing evidence that you have a varying rate of release in song. And they themselves say, this is elsewhere when they're talking about the biodegradable. He said today, it has a different method of biodegradable. Let's put aside the fact that this composition claim in 296 doesn't claim a manner of biodegradability. But when they describe it, they say, this is mechanical biodegradability. They call it a chewing gum patent. Well, by definition, that is also going to have a varying rate of release because you're having impact to the fiber through a chewing motion. They call it mechanical. It's not a gradual chemical, in their term, sort of deformation. So if you take song on its face and then you couple that with Mooney's testimony, they just don't have anything but attorney argument. And when you read the excerpts that they point to, it doesn't get you there. So I think claim 26 should be good. And that would cut short everything else I'm going to say because you could stop there. But if you did get past anticipation on claim 26 and that claim survived, I'm happy to answer questions about the other claims. But I think that's straightforward. There is no manner of biodegradability claimed. It's a composition claim, not a process claim. They can't point to any claim language there. It's the same words identifying the same polymer for the exact same purpose, to form a drug-eluting fiber. So can I ask you a question on the briefly argued willfulness JMO cross-appeal? Assume that the district court applied the correct standard. Nevertheless, the district court is deciding, necessarily, that the jury could not reasonably find the intent to infringe. Why was that on the record here not a jury question? That was not a jury question because this case is almost on all fours with Bayer, which is the case that you relied on. And I'm going to say that in three critical respects when I say it's all fours. In Bayer, you assumed the alleged infringer had knowledge of the infringer, found to be infringer, just like here, had knowledge of the patent. Then they went back. This was the allegation in Bayer, almost identical. It's eerie how identical. They said they went back because their initial design was ineffective. They went back in light of the new patent and re-engineered it and submitted to the FDA the new design. And then we know it infringed. So those are the three critical pieces in Bayer. Same three critical pieces here. They say that Boston Scientific had awareness of the 296 patent because it was cited in the presentation. They went back and redesigned it to have the polymer ratios and immiscibility that they talk about. And then they infringed. So from that course of conduct, you can assume that it rose to the level of willful infringement. This court said in Bayer, no, that is not enough. That can show that they knew of the patent and they did it. But that's not enough to show specific intent to infringe, that they knew that it would be violating the patent. So I think that under Bayer, that's our best case. I think that is the best case. It's rare that you get a case that's so on point. But that would be my response, Your Honor. On immiscibility, their expert conceded that he was adding to the claim construction that was given. Point blank, we copy the colloquy verbatim into our yellow brief, our reply brief, which shows that he's adding the one homogenous solution. So this is not just an example. I don't think that that actually moves the ball for you. Sure. But our point is, we were good with the claim construction as the district court gave it, incapable of dissolution. And this is really an exurgent type case. We didn't have a problem with the claim construction. It's the other side that is contradicting the claim construction by requiring this to go all the way to one homogenous solution in order to be not immiscible. And so that's our primary submission on immiscibility, which cuts across all of the claims. This would not be, given the clock, a good time to start a four-minute argument about fiber. OK. It would be a good time? It would not be a good time. It would not be a good time. OK. So I can conclude. Thank you, Your Honor. Thank you. Thanks, both parties, and the case is submitted.